**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE: SCRAP METAL | : | **CASE No. 1:02 cv 0844** |
| ANTITRUST LITIGATION | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| | : | |
| | : | **ORDER** |
| | : | |

This matter arises on two post-trial motions filed by Defendant Columbia Iron and Metal Company ("Columbia"). Class Plaintiffs ("Plaintiffs") oppose the motions, which have been extensively briefed and are now ripe for resolution. The pending motions are:

1. *Columbia Iron and Metal Company's Renewed Motion for Judgment as a Matter of Law* ("Motion for Judgment") (Doc. 645); and

2. *Columbia Iron and Metal Company's Motion for New Trial or Amendment of Judgment* ("Motion for New Trial") (Doc. 646).

For the reasons outlined below, Columbia is not entitled to: (1) judgment as a matter of law; (2) a new trial; or (3) amendment of the judgment. Accordingly, Columbia's motions are **DENIED**. The jury's verdict (Doc. 636) and the Court's judgment (Doc. 640) stand.

## I.     BACKGROUND

By way of introduction, the Court briefly summarizes below the events and allegations that led to the trial in this case. The following is only a summary, however. The evidence presented and legal

determinations made during the trial, which give rise to the present motions, are presented as necessary in the discussion section of this Order.

Manufacturing processes for products with metal components generate both ferrous and nonferrous industrial scrap metal.  This scrap metal can be resold to mills and foundries, which recycle the scrap into the manufacture of new metal products.  The Defendants[1] operate businesses that buy residual scrap from industrial and other customers and resell it in Ohio and other states.  Generally, Defendants submit bids to customers, in which they offer to purchase scrap generated during a given period of time, at a specified variance from the pricing for scrap set forth in various publications, such as *Iron Age* magazine.  For this reason, the customers (*i.e.*, the Plaintiffs) are often referred to as scrap "generators."  If a bid is accepted, a contract is entered into at the bid price, for the bid period. Defendants then leave collection boxes with their customers, where the scrap is deposited for pick-up. Once retrieved from the collection boxes, the Defendants weigh the scrap they have collected, pay the generator per the contract, and then, for example, resell it to mills or foundries.

In this case, Plaintiffs alleged that, beginning no later than December 1992, Defendants conspired to restrain trade, suppress and eliminate competition and fix the price of scrap in Northeastern Ohio.  Plaintiffs asserted that Defendants furthered this conspiracy through a variety of unlawful and improper acts, including the following:

(1)     Participation in meetings and conversations to allocate customers and rig bids for the purchase of scrap metal;

---

[1]     Ultimately, due to settlements with most of the originally named Defendants and dismissals of certain others for various reasons, only three of the many original Defendants went to trial in this case, two of whom are related entities.  Though Columbia was the only Defendant the jury found to be liable, for ease of reading only, the Court generally refers to "Defendants" as a whole throughout this section of its Order.

(2)     Participation in meetings and conversations to set pricing for the purchase of scrap and exchange of documents establishing the agreed-to pricing for certain accounts;

(3)     Engaging in "quid pro quo" arrangements to compensate the pre-arranged losing bidder or companies that agreed to refrain from bidding, *i.e.*, by agreeing to sell the losing bidder specified volumes of scrap at favorable pricing;

(4)     Submitting rigged and collusive bids to Plaintiffs and class members;

(5)     Intimidating other scrap dealers not to offer competitive bids;

(6)     Maintaining the illegal conspiracy by directing Defendants' own employees not to compete for certain customers;

(7)     Imposing financial penalties on co-conspirators that disobeyed customer allocation agreements and other rules of the conspiracy; and

(8)     Concealing the conspiracy by holding meetings in secret and withholding information from government investigations.

In support of their allegations that Defendants' conduct amounted to anti-competitive activity, Plaintiffs pointed to a variety of specific incidents, each of which was presented to the jury by way of documentary evidence and testimony from various employees of the Defendant-companies.  For example, Plaintiffs provided evidence that:

(1)     In or about 1993, Atlas Lederer Company, Inc. ("Atlas Lederer")[2] employees were directed not to compete for a certain account because the account "belonged" to another scrap dealer; and

(2)     In or about 1995, a major stamping company and longtime Weingold customer put its scrap out to bid.  At that time, Atlas Lederer had a pending bid for the scrap.  At Columbia National Group, Inc.'s direction, Atlas Lederer retracted its bid, allowing Weingold to retain the contract.  In exchange for Atlas Lederer's retraction, Weingold then sold volumes of scrap to Columbia Trading, Inc.[3]

---

[2]     For most of the conspiracy period, Atlas Lederer was a subsidiary of Columbia.

[3]     Weingold and Columbia National Group, Inc. ("Columbia National") also were Defendants in this case.  Weingold settled with the Plaintiffs and Columbia National was found not to be liable by the jury.

3

Plaintiffs also asserted that the Defendants and other co-conspirators directed salespersons not to bid on certain accounts, placed phone calls to employees of other co-conspirators complaining that they were driving up the prices of scrap and threatened non-conspirators with retaliation for bidding on the accounts of conspirators.  According to Plaintiffs, the clear intent of these actions was to depress pricing to non-competitive levels by removing the "competitive" component of the scrap metal business from the market.  Plaintiffs contended that, as a result of Defendants' unlawful conduct, Defendants intended to, and did, reduce and restrain price competition in the purchase of scrap metal, with the result that prices paid to Plaintiffs essentially were fixed, restrained or maintained at artificially low levels during the conspiracy period.

In addition, Plaintiffs alleged that Defendants fraudulently concealed their unlawful conspiracy from Plaintiffs until at least March of 2000.  At that time, Plaintiffs learned that Defendant Bay Metals, Inc. ("Bay Metals") had agreed to plead guilty to a conspiracy with unnamed co-conspirators to rig bids and to allocate supplies of ferrous and nonferrous scrap from 1992 through 1999, all in violation of 15 U.S.C. § 1.  Plaintiffs asserted that they did not discover this secret activity until it was disclosed to the public by government attorneys with the filing of a criminal complaint.  According to Plaintiffs, Defendants fraudulently concealed their conspiracy through:

(1)     Secret meetings and telephone calls in which the prices, bids and markets for scrap were discussed and agreed to;

(2)     Allocating secretly among themselves sellers of scrap (including, among others, Plaintiffs) and/or contracts for the purchase of scrap;

(3)     Creating a false and misleading appearance of competition for Plaintiffs;

(4)     Instructing members of the conspiracy not to divulge the existence of the conspiracy to others who were not in the conspiracy;

4

(5)     Limiting the anti-competitive, unlawful plan to a small number of people and key officials at each Defendant company and misrepresenting the reasons for unlawful conduct to their own employees;

(6)     Avoiding references in documents regarding conduct which would constitute an antitrust violation or anti-competitive act, destroying documentary proof and/or creating code words and code names in records to disguise the activities of the conspiracy.

(7)     Participating in secret meetings and conversations to monitor and enforce adherence to the agreed-upon prices, bids and market shares; and

(8)     Falsely representing to sellers that prices were fair and competitive.

After years of litigation, including certain delays occasioned by deference to the on-going criminal proceedings, all but three of the Defendants in this case were either dismissed by or settled with Plaintiffs.  The three Defendants that refused to settle are Columbia National Group, Inc., Columbia Trading and Metal Company and DeMilta Iron and Metal.[4]  Following the Court's denial of those Defendants' *Daubert* and summary judgment motions, they proceeded to trial.  Trial commended on January 24, 2006 and continued until February 7, 2006, at which time the jury received the case and began its deliberations.

On February 9, 2006, the jury returned a split verdict, finding only one of the three trial Defendants liable.  As to Defendants Columbia National Group, Inc. and DeMilta Iron and Metal, the jury found no liability.  As to Defendant Columbia Iron and Metal Company, however, the jury found in favor of Plaintiffs and awarded them $11,500,000.00 in damages.  The Court then entered judgment in favor of the Plaintiffs and against Columbia Trading and Metal Company in the amount of

---

[4]     As is evident from their name, the two "Columbia" Defendants are related business entities.  In sum, Columbia National Group, Inc. is the parent holding company for Columbia Iron and Metal Company (also called "Columbia Trading").  These two Defendants were jointly represented by the same counsel throughout this case.

$23,036,000.00.[5]  The instant motions followed.

## II.   **DISCUSSION**

Columbia moves for judgment as a matter of law and, alternatively, for a new trial or a reduction of the $23,036,000.00 judgment.  In support of these motions, Columbia presents a multitude of "arguments,"[6] each of which relate to Columbia's overarching theme that the Plaintiffs have failed sufficiently to prove their right to receive damages and their assertion that Columbia received an unfair trial.[7]  Given the nature of these arguments, the Court is compelled initially to make certain observations, the effect of which drastically narrows the Court's substantive analysis of Columbia's motions.

First, Columbia essentially complains in its motion for a new trial that the Court caused the verdict against it by subjecting Columbia to an unfair trial.  These complaints, which are general in nature and not geared toward identifying any harm specific to Columbia, are indeed ironic given that

---

[5]    Pursuant to 15 U.S.C. § 15(a), the Court tripled the jury's award to $34,500,000.00.  The Court then offset that amount by the monies received from the other Defendants' settlements, which totaled $11,464,000.00.  No party disputes the amount of the judgment in this regard.  Columbia only challenges the underlying verdict amount as being unduly excessive.

[6]    As will become evident, one of the principle weaknesses of Columbia's motions is that they contain little to no actual argument on many of the issues presented.  Nevertheless, the Court often refers herein to Columbia's bases for its motions as "arguments."

[7]    Columbia has not renewed its Rule 50(b) motion on grounds that Plaintiffs submitted insufficient evidence of the existence of a conspiracy.  Presumably because, as the Court noted when it ruled on Columbia's initial Rule 50(b) motion at trial, there was substantial evidence of the fact of a conspiracy, Columbia has wisely narrowed its "sufficiency of the evidence" claims and focuses primarily (though not exclusively) on the strength (or weakness) of Plaintiffs' proof of damages.

Columbia's two co-Defendants, subjected to the same trial experience, were found not to be liable.  This is particularly true given that Columbia's relationship to Columbia National is that of parent-child (in the corporate sense).  It is not as though the Columbia Defendants were completely independent entities, some of whom were deemed liable and others who were not, which is common in multi-defendant cases.  Here, half of the related Columbia entities clearly benefitted from the manner in which the trial was conducted.  While this observation amounts only to "irony," given that Columbia contends that the trial as a whole was patently unfair (further addressed below),  its complaint really boils down to the fact that it lost at trial, and that it does not believe that it should have.  Indeed, given Columbia's conduct throughout the trial – including conduct tantamount to suborning perjury by a key witness – and the Court's exercise of significant restraint in connection with that misconduct so as to afford Columbia, out of an abundance of caution, the fairest trial possible, Columbia's claim now that the trial was "unfair" is, to be put mildly, surprising.[8]  This conclusion is emphasized by the petty nature of most of Columbia's "arguments," and the invective to which it resorts to try to support those arguments.

Next, Plaintiffs' criticism that Columbia's motions largely are nothing more than a list of

---

[8]   Columbia's motion lends the impression that the only rulings this Court made were rulings unfavorable to it and its co-Defendants.  That is far from an accurate picture of the trial proceedings. A review of the transcript reveals many instances in which rulings vigorously sought by the Plaintiffs were not made and those vigorously opposed by Plaintiffs were made. In other words, Columbia prevailed in its requests for evidentiary and other (including jury instruction) rulings at many critical points during the trial. While Columbia's current motion ignores that fact, it is, at bottom-line, a fact.

unsubstantiated complaints is quite accurate.[9]  Indeed, based on its own numbering, Columbia asserts

over 20 reasons why it believes it is entitled to judgment in its favor and/or receipt of a new trial – *i.e.*,

5 arguments for judgment in its favor, 19 arguments for a new trial and 1 argument for reducing the

judgment.[10]  As to a majority of these reasons, however, Columbia provides no substantive argument

or support.  Nevertheless, the Court thoroughly has reviewed each of Columbia's arguments, as well

as the complete trial record and the Court's many prior written and oral orders.  Despite the Court's

desire to address each and every fruitless complaint Columbia continues to assert, however, not all of

Columbia's arguments warrant substantive consideration.  As such, and in the interest of conserving

judicial resources, the Court exercises significant restraint in its selection of those issues worthy of

attention beyond that which the Court has already provided prior to or during the trial.  In this regard,

it is noteworthy that the bulk of Columbia's motions present nothing new, they simply reiterate (usually

without argument) previously asserted complaints made at trial.

Given these general observations, and for reasons that follow, the Court refuses substantively

to reconsider the following numbered arguments in support of Columbia's request for a new trial:  4,

---

[9]     Columbia's motions simply list a series of unsupported criticisms – akin to
"assignments of error" in an appellate brief.  In response to the Plaintiffs'
criticism that argument is lacking, Columbia states that it has already "vetted" the
issues with the Court and outlined the nature of its objections on the record –
thereby implying that additional explanation is unnecessary.

For the same reasons Columbia refused to provide argument in its motion as to
many issues, however, the Court need not revisit each of its reasoned
determinations in relation to those objections.  The record clearly reflects the
Court's analysis and conclusions on those many issues.

[10]    Admittedly, some of these arguments are duplicated in Columbia's motion for
judgment as a matter of law and a new trial.  Nevertheless, Columbia reasserts
them in each motion.

5, 10, 11, 15, 16, 17, 18 and 19.  *See* Doc. 646.  On these issues, the Court stands on the trial record, which adequately outlines the Court's rulings and requires no supplementation.[11]

While some of the issues presented certainly are worthy of post-trial discussion, the majority of Columbia's arguments – specifically those in its motion for a new trial – are dedicated essentially to complaining about virtually every ruling the Court made against Columbia both before and during the trial.  These rulings involve everything from the Court's articulated resolution of admissibility and jury instruction / verdict form issues – which the Court discussed <u>at length</u> with the parties on the record and, in some cases, later outlined in written orders – to granting deadline extensions to Plaintiffs in connection with various briefs and their responses to Columbia's trial exhibit objections.  It is simply beyond comprehension that Columbia asserts "deadline extensions" as <u>three</u> independent grounds for entitlement to a <u>new trial</u>, <u>including</u> a one-day "extension" to allow a filing on the day after a federal holiday, rather than the holiday itself.[12]

_____

[11]     In addition to providing little or no argument on these issues in its motion, Columbia likewise fails to provide argument on these issues in its Reply Brief, despite the Plaintiffs' methodical and cogent response to each of the issues Columbia chose to assert nakedly in its motion.

[12]     The Court, as is its policy when appropriate, has liberally accommodated <u>all</u> parties with extensions of time and leave to exceed page limitations.  Indeed, throughout these proceedings the Court accommodated numerous procedural requests from Columbia and its co-Defendants to extend deadlines and page limitations, and even to excuse violations of court orders. When the Court did limit its accommodation, moreover, Columbia saw fit to ignore or "get around" those limitations in any event.  For example, despite the Court's *partial* refusal to grant Columbia leave to exceed the page limitation for its Reply Brief (5/12/06 non-document order) – *i.e.*, the Court granted leave for an additional 10 pages only – Columbia seemingly manipulated its brief's length by altering the font size throughout the brief, as evidenced by the small typeface that is inconsistent throughout.  No doubt such a maneuver would have drawn criticism by Columbia – perhaps to the point of arguing that a new trial is warranted – had Plaintiffs engaged in similar gamesmanship.

Though certainly not as offensive as the proposition that a deadline extension warrants a new trial, but still warranting no substantive response, are Columbia's various arguments relating to jury instructions, the verdict form and other random issues of admissibility.[13]  For example, Columbia summarily asserts – without <u>new</u> argument or legal support – that the Court erred by not including <u>all</u> of Columbia's proposed jury instructions[14] and verdict form questions.  In so far as Columbia's arguments on these issues have not materially changed, and the evidence presented at trial does not materially impact the Court's prior analysis of them (except possibly to make its original conclusions

_____

[13]     Columbia revisits several admissibility issues.  For example, it nakedly asserts that it is entitled to a new trial based on the Court's:  (1) allowance of Howard Bahm's trial deposition on the eve of trial; (2) admission of alleged co-conspirator statements; and (3) disallowance of Donald Messinger's testimony.  *See* Doc. 646, Nos. 10, 11 and 15.  These issues, however, squarely were addressed by the Court during various pre-trial conferences, on the record, and in several written orders. *See* Docs. 530, 561 and 580.  Columbia's post-trial complaints on these issues are no different from its pre-trial and in-trial complaints; therefore, the Court's prior analyses apply with equal force and need not be repeated simply because Columbia has chosen summarily to reassert its prior arguments without even attempting to articulate the nature and/or scope of the arguable prejudice it believes to have flowed from the Court's determinations.  Obviously, such articulations are necessary to a finding that a new trial is warranted and are likely necessary to preservation of a new-trial request on those grounds.

[14]     Though Columbia *selectively* addresses several specific issues relating to various jury instructions and the verdict form (Doc. 658 at 29-36), in its Reply Brief, Columbia did so only in response to Plaintiffs' criticism of its summary argument that <u>all</u> of its proposed instructions and verdict questions should have been adopted.  In this regard, Columbia admits that its specific attention to the few issues on which it chose to elaborate is merely to appease the Plaintiffs' concerns – *i.e.*, it is not to provide <u>new</u> argument.  Indeed, Columbia claims that "the grounds for its objections were <u>fully</u> vetted with the Court."  Doc. 658 at 29 (emphasis added).  Likewise, the Court's responses to Columbia's original objections on these (and all) issues relating to the jury instructions and the verdict form were fully explained on the record during the charge conference and need not be reiterated here.  The Court stands on the record with regard to these issues and, therefore, need not substantively respond to Columbia's selective and belated arguments.

10

stronger), the Court need not re-articulate its determinations on these issues.  For the same reasons the Court refused to reconsider arguments again and again at the January 16, 2006 Final Pre-Trial Conference, the Court, though tempted, likewise refuses to revisit these issues again.[15]  The Court stands by its prior rulings on these issues.

For these reasons, this Order substantively addresses only some of Columbia's many arguments for judgment as a matter of law and for a new trial.  In sum, the Court addresses the following:

- Arguments 1, 2, 3, 4, and 5 in Columbia's motion for judgment as a matter of law (Doc. 645); and

- Arguments 1, 2, 3, 6, 7, 8, 9, 12, 13, and 14 in Columbia's motion for a new trial (Doc. 646.  (Note:  Arguments 1, 2, 3, 8, 9 and 13 simply mirror the arguments in Columbia's motion for judgment as a matter of law and do not warrant separate attention.  Argument 12 is addressed briefly below only; beyond the comments below, it warrants no additional consideration.  Accordingly, as to the motion for a new trial, only arguments 6, 7 and 14 warrant <u>individual</u> attention).

### A.    The David Miller Outline (*i.e.*, the Miller Script)

Before turning to its analysis of those issues worthy of substantive attention, the Court addresses Columbia's charge that the Court inappropriately breached the attorney-client privilege by disclosing to Plaintiffs' counsel an outline that David Miller, Columbia's chief executive officer, used to "prepare"

---

[15]    At the January 16, 2006 Final Pre-Trial Conference, in response to Columbia's counsel's insistence to argue and re-argue points that had been discussed at length by the parties and the Court in that and prior proceedings (under the guise of "preserving the record"), the Court commented:

> *I'm going to rule on a number of these issues.  You have briefed them to death.  If you don't like my rulings at this point, you can take them up with the Court of Appeals.  I don't want every time to sit up here and hear "just for the record, I'm going to tell you how wrong you are again, Judge."*
> *So, I'm going to rule on these motions and then we'll move forward.*

January 16, 2006 Tr. at 39-40.

for his trial testimony and which he had at the trial table with him throughout the trial days leading up to his testimony.  Though for different reasons than Columbia presents, this issue warrants discussion. Rather than grounds for a new trial, the events surrounding the discovery and disclosure of the "Miller outline" demonstrate (1) gross misconduct by Columbia <u>and its counsel</u>, and (2) the Court's efforts, despite that misconduct, to provide Columbia (and all parties) a fair trial in any event.[16]  They certainly do not support the view that a new trial is warranted.  In so far as Columbia's attack on the Court's resolution of this issue is so fundamentally flawed, the Court is compelled to respond.

David Miller was examined in three contexts during the trial.  On January 26, 2006, he was called "as on cross" during the Plaintiffs' case.  At best, as is readily discernable from the trial transcript and the Plaintiffs' <u>accurate</u> and <u>unopposed</u> description of the same in their Opposition Brief (Doc. 655), Miller repeatedly – and admittedly – testified inconsistently with his prior deposition testimony.  On numerous occasions, Plaintiffs' counsel directed Miller to prior deposition testimony that was directly at odds with his trial testimony.  In response to these blatant inconsistencies, among other things, Miller explained that he had trouble remembering various past events due to the passage of time.  Though the Court's function in connection with the present motions is not to weigh Miller's credibility, in connection with this discrete issue, it is a fair and objective observation that Miller's testimony was,

---

[16]     Indeed, though Columbia touts the Court's disclosure as a breach of the attorney-client privilege, it provides no argument or legal support for the proposition that the disclosure – assuming the material was privileged – justifies a new trial under Rule 59.  In so far as Columbia fails to support its assertion, the Court need not engage in independent research and analysis of that issue.  In any event, given the circumstances here, Columbia has no basis to argue any wrongdoing by the Court or Plaintiffs' counsel.  The Court limits its discussion here, therefore, to clarifying the record, rather than analyzing whether prejudice flowed from the disclosure.  If anyone or anything was prejudiced by these events, it was the Plaintiffs and the integrity of the trial process, not Columbia.

12

at best, consistently inconsistent.

On February 1, 2006, Miller testified again, this time in Columbia's case in chief.  In an obvious (and understandable) effort to rehabilitate Miller's credibility and clarify his prior trial testimony, Columbia's counsel revisited many of the topics on which Miller had testified.  Miraculously, Miller's recollection improved.  Without any qualifications that his memory had been refreshed by material outside of his own recollections, and without any in-court efforts by Columbia's counsel to refresh his recollection with specific documents or other evidentiary materials, Miller testified that his prior recollections on a variety of the topics covered by Plaintiffs' counsel were incorrect.  He then went on to provide articulate and detailed recollections on the very topics he struggled to recall only days before.  He swore under oath that he then had a current and very specific recollection of virtually every event, discussion, or transaction relevant to Plaintiffs' claims.

On February 2, 2006, Plaintiffs' counsel had a second opportunity to cross-examine Miller, this time as Columbia's witness.  Among other things, counsel questioned Miller's ability suddenly to recall things (or to recall things underlinedifferently) on direct examination which, only days before, he could not remember.  In the course of that inquiry, the following exchanged occurred:

Plaintiffs' counsel:  Last week you didn't recall anything about this, did you?

Miller:  If that's what I said, that's what I said.

Plaintiffs' counsel:  And who helped you remember this stuff?

Miller:  I went through the whole scenario from start to finish.  I went through the testimony, and the lawyers helped me with an outline.

Plaintiffs' counsel:  Did the lawyers give you a written outline that helped you remember things?

13

| | |
|---|---|
| Miller: | No, they did not give me a written outline. |
| Plaintiffs' counsel: | What's the outline you just referred to? |
| Miller: | An outline to show me, you know, '95, '91, '99, '88, helping me to put the thing together. |
| Plaintiffs' counsel: | Was that a written outline? |
| Miller: | It was a written outline, yes. |
| Plaintiffs' counsel: | And you used this written outline to prepare for your testimony? |
| Miller: | Yes. |
| Plaintiffs' counsel: | Okay.  And it was prepared by someone other than you? |
| Miller: | No, it was prepared for me – by me – it was written by somebody else and with me, yes. |
| Plaintiffs' counsel: | And where is this outline, sir? |
| Miller: | Sitting on that table. |

Tr. at 1351 (emphasis added).[17]

At that point, all counsel assembled at sidebar and Plaintiffs' counsel asked to see the "outline" to which Miller referred.[18]  Columbia's counsel objected, arguing that the document is a privileged

---

[17]   Unless otherwise identified as such, all references herein to "Tr." relate to the <u>trial</u> transcript.

[18]   The "Miller Direct Examination Outline" was submitted "Under Seal" only in so far as it was not to be presented to the jury.  It is, however, part of the record in this case.  For ease of reference, it is attached as an exhibit to this Order.

14

communication between he and his client and that it was prepared with Miller,[19] not so as to form the basis for his testimony, but only to serve as an "aid" in preparation for his trial testimony.[20]  In this regard, Columbia argued that the outline, and counsel's discussions with Miller prior to his direct examination, were standard witness preparation materials and activities.

In sum, Plaintiffs' responded that, despite his inability to recall certain information only days before, Miller's testimony on direct examination was that he had present – though now different – recollections of the same information.  He did not voluntarily indicate that his revised memories derived from reviewing external materials or by being "refreshed" by discussions with his lawyers.  On cross, however, he confessed that, because he has problems recalling things, he and his lawyers had gone "through the whole scenario from start to finish . . . and the lawyers helped [him] with an outline."  Plaintiffs argued, therefore, that Miller's testimony as presented on direct was incredibly – and intentionally – misleading because it led the jury and the Court to believe that he had present recollections of the topics covered, when clearly he did not.  It did not, moreover, allow the jury to assess the strength of his current recollections by providing a fair and honest account of how they came

---

[19]  Columbia's counsel summarized the creation of the outline essentially as a running compilation – *i.e.*, recording – of facts that Miller had "remembered" over a two-year period.  *See* Tr. at 1374-75.  In this regard, counsel argued that the content of the outline originated with Miller's "historical recollection" and, therefore, was not problematic.  Of course, this explanation – even if true – does not justify counsel's knowing decision to place Miller on the stand to say that he remembered at the moment of his testimony that which was in the outline.  As evidenced by his inability to remember many of the same facts on cross-examination during Plaintiffs' case, clearly Miller did not have present recollections, as he and his counsel led the jury and the Court to believe.  Under this explanation, the outline was actually an outline of counsel's recollections, not Miller's.

[20]  The Court's exchange with counsel at sidebar appears at pages 1353-1358 and 1365-1375 of the trial transcript.

15

about – *i.e.*, by knowing what "refreshed" his memory. Rather, Miller's "recollections" amounted to nothing more than "recitations" of the materials his lawyers had assembled into a 7-page outline, argued the Plaintiffs.

As outlined by the Court during its sidebar conference with counsel, the problem with the "outline" is that it is not truly an "outline" at all – it is not a general outline of topics to be covered during an examination, where the witness will be asked to provide present recollections or knowledge, if any, on those topics.  Rather, it is an organized outline of <u>specific facts</u>; it was a script.[21]  Rather than refreshing Miller's recollection with documents while he was on the stand (*e.g.*, to verify dates or times), Columbia's counsel elected instead to educate Miller about facts which, whether he ever knew them or not, he did not presently recall, and then put him on the stand to testify, without qualification, that he <u>did</u> presently recall all of the topics covered in the outline.  While such conduct would be problematic in any case, as noted on the record, it is particularly troubling here because Miller had repeatedly testified that he had trouble remembering things, including most of the very topics covered in the outline.  With such a witness, for counsel to create a detailed fact-intensive outline, to provide that outline to Miller to study, and to allow Miller to rely upon that outline <u>as the basis for</u> his testimony, is clearly inappropriate.

There is no doubt that much of Miller's direct testimony was <u>not</u> grounded upon present recollections while on the witness stand, as he stated under oath.  Rather, as Miller later admitted, his testimony simply parroted the litany of facts his lawyers had reduced to a written outline.  In this regard, Miller's testimony was admittedly false and his counsel's assistance in preparing a script for that

---

[21]     Throughout the outline, hand-written comments appear discussing or expanding on the facts set forth.  Columbia's lead counsel admitted that some of the hand-written comments are his.

testimony, and allowing Miller to use it as he did without any effort to correct him or to explain the source of his new recollections, was tantamount to suborning perjury.

As such, and especially given the fact that the Court did not permit the jury to see the outline and limited Plaintiffs' counsel's use of it during the remainder of Miller's cross-examination,[22] Columbia's argument now that disclosure of the outline to the Plaintiffs warrants a new trial cannot be countenanced. As noted, the "outline" prepared for Miller's testimony was nothing more than a script, without which Miller admittedly was lost. Counsel's assistance in preparing the outline for the specific purpose of having Miller testify on direct as though he had <u>present</u> recollection of the issues discussed, likely warranted immediate sanctions. Exercising significant restraint, however, the Court merely permitted disclosure of the document to the Plaintiffs and limited their counsel with regard to its use. Frankly, the Court was at a loss at trial to understand how experienced counsel could not only allow a jury to be so mislead by testimony he elicited at trial, but to act outraged when the subterfuge he engaged in with his client was uncovered. The Court is even more at a loss to understand why that same counsel would choose to revisit that issue in this context.

**B.     Motion for Judgment as a Matter of Law – Rules 50(b)**

Columbia presents 5 arguments in support of its view that it is entitled to judgment as a matter of law, all of which relate to the sufficiency of the Plaintiffs' evidence relative to liability, injury and damages.   The Court addresses below each of the arguments Columbia asserts in connection with the deficiencies it claims relate to these elements of the Plaintiffs' antitrust claims.

**1.     Legal Standard for Rule 50(b)**

Federal Rule 50(b) governs post-verdict motions for judgment as a matter of law.  Pursuant to

---

[22]     *See* Tr. at 1357.

17

Rule 50(b), this Court has the power to grant judgment as a matter of law as to any "claim or defense that cannot under the controlling law be maintained." Fed. R. Civ. P. 50(b).  The "standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion."  Wright & Miller, Federal Practice and Procedure: Civil 2d §2537, p. 347 (footnote omitted).

Rule 50(b) applies essentially the same standard of review to a motion for judgment as a matter of law as to a motion for a directed verdict. *See* Advisory Committee Notes on 1991 Amendment to Fed. R. Civ. P. 50; *Gillentine v. Vanzant*, 1994 U.S. App. LEXIS 35160 at *17 (6th Cir. 1994).  Rule 50(b) allows the court to enter judgment as a matter of law "when the facts are sufficiently clear that the law requires a particular result."  Wright & Miller, Federal Practice and Procedure: Civil 2d §2521, p. 240.  Whether evidence presented at trial "was sufficient to create an issue of fact for the jury or will permit the court to enter judgment as a matter of law is solely a question of law to be determined by the trial court."  *Id*. at §2524, p. 249; *O'Neill v. Kiledjian*, 511 F.2d 511, 513 (6th Cir. 1975).

In cases involving federal questions,[23] "the appropriate standard for measuring the sufficiency of the evidence to direct a verdict under Rule 50 . . . is whether there is evidence upon which the jury could properly support a verdict in favor of the party against whom the motion is made."  *Patrick v. South Central Bell Tel. Co.*, 641 F.2d 1192, 1197 (6th Cir. 1980)(citation omitted).  The ultimate question, then, is whether the jury could properly find for the non-moving party when the correct legal standard is applied. *Markman v. Westview Instruments. Inc.*, 52 F.3d 967, 974 (Fed. Cir. 1995), *aff'd,*

---

[23]    Clearly, this case implicates a federal question – *i.e.*, it arose under the federal antitrust laws.   The Court points this out only because the standard of review applicable to a Rule 50(b) motion turns upon whether the case exists in federal court based on a federal question or diversity.  *See K&T Enterprises, Inc. v. Zurich Ins. Co.,* 97 F.3d 171 (6th Cir. 1996).

116 S.Ct. 1384 (1996).

The Court is not free to weigh the parties' evidence or to pass upon the credibility of witnesses. *Black v. Zaring Homes*, 104 F.3d 822, 825 (6th Cir. 1997); *K & T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).  Nor may the Court substitute its own judgment for that of the jury.  *Zaring Homes*, 104 F.3d at 825; *K & T Enters.*, 97 F.3d at 175-76.  Instead, the Court must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the record.  *Zaring Homes*, 104 F.3d at 825; *K & T Enters.*, 104 F.3d at 176. When the evidence would permit reasonable minds to differ on the issues decided by the jury, a motion for judgment as a matter of law must be denied.  *American and Foreign Ins. Co. v. Bolt*, 1997 WL 57361 (6th Cir. 1997).  In short, every effort must be made to uphold the verdict if reasonably possible.

### 2.    Discussion of Rule 50(b) Motion

As noted, Columbia presents 5 challenges to the sufficiency of the Plaintiffs' evidence, each of which it argues warrants judgment as a matter of law in its favor.  The first two arguments relate to liability.  The last three arguments relate to injury and damages.  In sum, Columbia argues that the Plaintiffs failed to provide sufficient evidence:

(1)    that Columbia was a participant in the conspiracy at all;

(2)    that Columbia was a participant in the conspiracy during the relevant statute of limitations period;[24]

(3)    that all members of the Plaintiff Class were injured;

(4)    that the named Plaintiffs individually were injured; and

---

[24]    Columbia identifies these first two items as arguments 1 and 5 in its motion.  For ease of reference, and because the Court analyzes these two arguments jointly below, the Court has not maintained Columbia's numbering scheme.

19

(5)     that an <u>identifiable amount</u> of damages were incurred by individual Plaintiff class members.

For the same reasons articulated by the Court in response to Columbia's initial Rule 50(b) motion at the close of the Plaintiffs' case, Columbia's sufficiency challenges relating to its participation in the conspiracy – either on the whole or during the relevant statute of limitations – are not well taken and certainly do not support entry of judgment *as a matter of law* in Columbia's favor when the Court, as it must, gives the benefit of all reasonable inferences to the Plaintiffs.  Given the standards this Court must employ at this stage of the proceedings, these arguments do not even present a close call.  In any event, the Court addresses them briefly below.

Columbia's three remaining challenges, which attack the sufficiency of the evidence presented on the issues of <u>injury</u> and <u>damages</u>, present closer questions.  In this regard, the Court noted during its oral ruling on Columbia's initial Rule 50(b) motion that the issues Columbia raised relative to damages present the greatest weakness in the Plaintiffs' case and would, as they had to that point in the trial, merit the closest scrutiny by the Court.

a.     **The Liability Arguments – Columbia's Participation in the Conspiracy, Both Generally and During the Relevant Statute of Limitations Period**

Columbia's view that the evidence cannot support the jury's conclusion that Columbia participated in the conspiracy, as with many of Columbia's other post-trial criticisms, is troubling because it is wholly unsupported by argument or reference to the record.  In its motion, Columbia *nakedly* asserts that the Plaintiffs failed to provide sufficient evidence that Columbia participated in the alleged conspiracy at all, much less within the relevant limitations period.  Nowhere, not even its reply, however, does Columbia outline the bases – legal or factual – for those assertions.  In response,

Plaintiffs' provide an exhaustive – and accurate – summary of the evidence presented at trial relevant to those issues, as well as specific references to portions of the record that support the jury's conclusion that Columbia participated in the alleged conspiracy during the limitations period, as tolled.  Columbia's Reply Brief completely ignores the liability issue – which Columbia raised in the first place – and addresses itself almost exclusively to the injury and damages issues.[25]  Accordingly, Columbia seemingly has abandoned its argument that the Plaintiffs' evidence on liability was insufficient.

As is the case with many of the other arguments Columbia asserts but does not support, the Court must decide, therefore, whether it should substantively address these issues.  Because the Court's oral resolution of these items – which are more "traditional" Rule 50 issues, as opposed to Columbia's laundry list of other complaints – was accurate but not exhaustive,[26] the Court deems them worthy of some consideration here, even if Columbia does not.  Given Columbia's acquiescence, however, the Court's efforts are directed primarily toward making a clear record as to the sufficiency of the Plaintiffs'

_____

[25]  As if to justify its failure to support the very issue it raises, Columbia states in its Reply Brief:

> . . . although [Columbia] believes that each original argument is meritorious, it will not restate every ground contained in its Motions for Judgment as a Matter of Law, for a New Trial or Amendment of Judgment.  This brief will focus on the following issues . . .

Doc. 658, "Introduction" section.  Columbia then went on to identify various "injury" and "damages" issues, which it discusses at length (though its discussion, as explained *infra*, was unnecessarily complicated).

[26]  *See* Tr. at 1129-30.

evidence on liability.[27]   The Court's discussion of these issues, therefore, will be brief and in large part derives from the Plaintiffs' summary of the evidence presented at trial.

As observed by the Court at the close of the Plaintiffs' case, sufficient evidence on the issue of Columbia's general "participation" in the alleged conspiracy <u>clearly</u> was presented.  The Court stated:

> Okay.  Well, the presentation of proofs has played out pretty much like the parties' briefs in this case foreshadowed, and that is that there was sufficient evidence of the existence of a conspiracy involving a sufficient number of the large competitors in the industry to have an industry-wide impact, and there was evidence that . . . [Columbia] . . . participated at some point in time or at varying points in time in some aspects of that conspiracy.
>
> The law is pretty clear that not all conspirators have to know of all the other participants, and that even having a small connection to the conspiracy can be enough.
>
> As . . . [Columbia] . . . argued, there are inferences that could be drawn the opposite way, but there is certainly sufficient evidence that would justify going to the jury on the issue of liability as it relates to the existence of a conspiracy and the participation of . . . [Columbia] . . . in a conspiracy.

Tr. at 1130.  The Court's conclusion in this regard was based on, among other things, the plethora of testimony from numerous Columbia employees and third parties in the industry.  Most significantly, these witnesses (as accurately outlined in Plaintiffs' summary – Doc. 655) testified that "unwritten" agreements existed between Columbia and other scrap dealers not to compete with one another, so much so that various competitors would complain to Columbia's chief executive, David Miller, if Columbia bid on an account that "belonged" to another scrap dealer.  Indeed, the evidence from which the jury reasonably could have concluded that Columbia <u>generally</u> participated in the alleged conspiracy

---

[27]     The brevity with which Columbia has approached its renewed motions suggests that Columbia's concern may only be that of preserving these issues for appeal. Given Columbia's failure to support, or otherwise provide some substantive argument in connection with most of its "arguments," however, it is possible that the issues have been waived in any event.

is staggering.  Columbia's argument that it is insufficient – especially because that argument is unsupported – is frivolous.

As the Court noted during the trial, while the 4-year statute of limitations complicates the sufficiency analysis, it is not fatal to it.  For the reasons outlined in the Court's consideration of the statute of limitations issue *infra*, and as the jury was instructed, the "critical date" for statute of limitations purposes was, at the latest, March of 1996 because – <u>at a minimum</u> – the limitations period was statutorily tolled under 15 U.S.C. § 16(i) as of March of 2000.  As outlined by Plaintiffs in their Opposition Brief, sufficient post-March 1996 evidence was presented, from which the jury reasonably could have concluded that Columbia's pre-March 1996 participation continued into the limitations period.[28]

The post-March 1996 evidence notwithstanding, the jury reasonably also could have concluded that <u>additional tolling</u> *via* the doctrine of "fraudulent concealment" was appropriate because:  (1) the Plaintiffs were entitled to argue that the conspiracy was self-concealing (like most conspiracies); (2) evidence was presented by the named Plaintiffs that they were unaware of the existence of the conspiracy until news of the government's criminal case against one of the Defendants broke; and (3) substantial evidence was presented from employees of the co-conspirators (including Columbia) that would justify the conclusion that efforts were, in fact, made to conceal the conspiracy.  Under such circumstances, the March 1996 "critical date" reasonably could have been moved forward by the jury to capture some <u>or all</u> of the Plaintiffs' pre-March 1996 evidence supportive of the conclusion that

---

[28]      *See* Doc. 655 at 24.  Because Columbia does not oppose the Plaintiffs' recitation of these post-March 1996 activity, the Court need not engage in a lengthy recitation of the same.

Columbia participated in the conspiracy.[29]

Considering the Plaintiffs' post-March 1996 evidence in conjunction with the fact the jury reasonably could have, and may have, concluded that the conspiracy was fraudulently concealed, thereby tolling the limitations period further and incorporating evidence of pre-March 1996 activities, the jury clearly had sufficient evidence upon which to base its unequivocal conclusion that Columbia participated in the conspiracy within the applicable statute of limitations period, either as set by the Court in its instructions, or as adjusted by the jury *via* a fraudulent concealment determination.  The Court finds, therefore, that the Plaintiffs presented sufficient evidence from which the jury reasonably could conclude that Columbia participated in the alleged conspiracy within the statute of limitations. Accordingly, Columbia is not entitled to judgment as a matter of law on this basis.[30]

**b.  The Injury and Damages Arguments – Sufficiency of the Evidence as to (1) Individual (*i.e.*, Named Plaintiffs) and Class-Wide Injury, and (2) Calculation of Damages of Individual Class Members.**

In connection with its challenges to the sufficiency of the Plaintiffs' evidence on injury and damages, the majority of Columbia's arguments here revisit the very issues addressed in its motion to

---

[29]  Plaintiffs also argue that the "continuing conspiracy" doctrine absolves them of any obligation to present evidence of Columbia's participation during the limitations period.  They argue that, once Columbia joined the conspiracy – which a reasonable jury certainly could conclude from the evidence as a whole – it becomes Columbia's burden to demonstrate withdrawal from the conspiracy.  Absent such a showing, Plaintiffs maintain that the jury reasonably may conclude, even without any evidence, that Columbia continued to participate in the conspiracy into the limitations period – whatever it is.  Indeed, Columbia specifically requested that a "withdrawal" instruction be given to the jury.  In light of the strength of the evidence outlined above, however, the Court need not address this alternative argument.

[30]  For the same reasons, though the Court further discusses this issue *infra*, Columbia is not entitled to a new trial on these grounds.

24

exclude Dr. Leitzinger's testimony – *i.e.*, its *Daubert* motion,[31] which the Court previously considered at length, despite the brevity of its denial order.[32]  In this regard, Columbia severely complicates the relevant issues.  The Court has already dedicated a considerable amount of time evaluating Columbia's *Daubert* challenges relative to Dr. Leitzinger and has concluded that, despite the many well-supported attacks levied against the data and assumptions upon which Leitzinger relied, those attacks were best reserved for cross-examination and did not render Leitzinger's testimony unreliable, and, therefore, inadmissible under *Daubert*.  As evidenced by its verdicts, the jury clearly was critical of Leitzinger's testimony, no doubt in large part due to counsel's vigorous cross-examination.

Given the import of the admissibility issue, the Court briefly addresses Columbia's primary *Daubert*-related concerns.  Thereafter, the Court addresses the truly relevant post-trial inquiry, which is whether Leitzinger's testimony provided a sufficient basis from which the jury reasonably could reach the conclusions it clearly did – that Plaintiffs established that individual and class-wide injury occurred and that damages were warranted in light of that injury.[33]  Though the Court has struggled – both prior to the trial and now after the trial – with the question of whether judicial intervention is justified in light of certain weaknesses in Leitzinger's analysis, its conclusion remains the same – they are weaknesses for the jury to have assessed, which it did.

---

[31]    Pursuant to *Daubert v. Merrell Dow Parm., Inc.*, 509 U.S. 579 (1993), Columbia sought to exclude the testimony of Plaintiffs' expert, Dr. Leitzinger.

[32]    Columbia's efforts in this regard appropriately are limited to its request for a new trial, and not for judgment as a matter of law.

[33]    The Court addresses *infra* the more pointed issue relating to the jury's ability to return an $11.5 million award based on the evidence presented at trial.  Columbia argues that the evidence did not support that specific figure and, therefore, the verdict necessarily is flawed.  The Court disagrees.

25

### 1.     Columbia's *Daubert* Challenges

While the Court need not engage in an exhaustive *Daubert* analysis, it will address several of the arguments Columbia continues to make in support of the view that Leitzinger's testimony should have been excluded as patently unreliable.  Given the nature of Columbia's criticisms, however, the Court deems it relevant first to remind Columbia that the Court's "gatekeeper" role under *Daubert* is limited; *Daubert* is not to be used to exclude expert evidence simply because it has weaknesses.

In this regard, the Court "need not and should not determine the scientific validity of the conclusions offered by an expert witness.  Rather, to decide admissibility the trial judge should only consider the soundness of the general scientific principles or reasoning on which the expert relies and the propriety of the methodology applying those principles to the specific facts of the case."  29 Wright & Gold §6266 at 271-72.  Thus, if a court "rules that [a certain] expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable.  [Rule 702] is broad enough to permit testimony that is the product of competing principles or methods in the same field of expertise."[34]  *Advisory Committee Notes*.  *See Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.").  The flexibility of the *Daubert* inquiry "gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science, while admitting

---

[34]     As outlined further *infra*, though the experts in this case did not have directly competing roles – *i.e.*, Columbia's expert was not tasked with performing an independent damages analysis – they did have competing theories as to how best to apply Leitzinger's damages model.

reliable expert testimony [– even competing expert testimony –] that will assist the trier of fact." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Since the admissibility of expert testimony is an issue to be resolved by the trial judge under Fed. R. Evid. 104(a), the Court "need only find by a preponderance of the evidence that the expert's reasoning and methodology is scientifically valid." 29 Wright & Gold §6266 at 276 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).  Rule 104(a) serves to underscore that *"Daubert* does <u>not</u> require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct." *Ruiz*, 161 F.3d at 85 (emphasis added); *see Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) ("it is the expert witnesses' methodology, rather than their conclusions, that is the primary concern of Rule 702").

Thus, under *Daubert*, "the rejection of expert testimony is the exception rather than the rule." *Advisory Committee Notes*.  This is, in part, because the Supreme Court prefers that litigants rely upon "the capabilities of the jury and of the adversary system generally," rather than "wholesale exclusion" of fairly supported, relevant testimony by the Court.  *Daubert*, 509 U.S. at 596.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.*  This principle remains true even in the most complicated cases.  "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz*, 161 F.3d at 85 (quoting *Daubert*, 509 U.S. at 590).  The Court's role is "that of gatekeeper[, not] that of armed guard."

27

*Id.* at 86.[35]

With these and the many other *Daubert* considerations in mind, the Court previously evaluated all of Columbia's criticisms of Leitzinger's analysis and concluded that it was admissible because, though <u>weaknesses</u> existed in Leitzinger's application of the model he employed, the model itself was not economically flawed, nor were the weaknesses so patently clear or pervasive as to justify outright exclusion under *Daubert* on the theory that they tainted the otherwise acceptable model.  Sufficient room for debate existed as to Columbia's criticisms and Plaintiffs' responses thereto.  Yet, Columbia persists in these debates, now to the point of essentially calling Leitzinger an incompetent liar.  Given the circumstances of this case, and certainly the <u>nature</u> and severity of Columbia's repeated attacks, the Court is compelled to respond, even if only briefly.

Columbia presents two primary criticisms of Dr. Leitzinger's work.  First, it argues that Leitzinger inappropriately <u>used and adjusted</u> processed scrap metal prices identified in the *Scrap Price Bulletin*[36] when calculating his comparative price spreads during and after the conspiracy period.  Second, it argues that Leitzinger's decision to "average" the various calculated price spreads – which

---

[35]     The Court's above review is not intended to be an exhaustive recitation of the legal standard under *Daubert*; many additional considerations accompany a complete *Daubert* analysis.  This review is intended only to emphasize that *Daubert's* purpose is not to be unduly restrictive of expert testimony.  Its intent is simply to afford the Court limited control over extreme and unreliable expert testimony.  Generally speaking, however, the jury is the most appropriate audience for expert testimony, even if it is complex.

[36]     The *Scrap Price Bulletin* is a pricing index published in *Iron Age Magazine*. It, along with other publications such as *American Metal Markets*, is used by scrap dealers (and generators, perhaps) as a pricing guide.

Columbia further maintains were generated from an unacceptably incomplete[37] data set – was fatal to the accuracy of his analysis.  Both at trial and in its *Daubert* motion, Columbia introduced these criticisms through (1) counsel's argument (on brief and on cross-examination) and (2) its expert, Dr. McAnneny, who admittedly limited his efforts to criticizing Leitzinger's damages analysis, but did not conduct an independent analysis of his own.  As such, the jury was not presented with competing underline methods for calculating damages.  Rather, the jury was presented with evidence of only one damage calculation method – the experts simply disagree as to certain aspects of that model's application and of the results compelled by appropriate application of it.

A simplified explanation of Leitzinger's analysis is as follows.  First, he compiled electronic transaction data recovered from former Defendants Weingold and Rock. This compilation included transaction data from 69 Plaintiff generators.  The data served as Leitzinger's representative sample of dealer-generator transactions during and after the conspiracy period.  Having divided the data into two categories – *i.e.*, "during" and "after" the conspiracy transactions – Leitzinger analyzed the differences in the margins (*i.e.*, profits) the dealers were enjoying during the conspiracy as compared to after the conspiracy, when the anti-competitive conduct had ended.  To do that, Leitzinger observed the price paid to a given generator and compared that figure to an index price (*i.e.*, from the SPB) that generally governed the amount the dealer would recoup *via* its later sale – after processing – to a steel mill or foundry.  That analysis identified the dealer's margin, or profit.  Leitzinger made the same observations as between the same dealer and generator for transactions that occurred after the conspiracy period.  The difference between the "during" and "after" margins, to Leitzinger, manifested the underline effect of the removal

---

[37]     The Plaintiffs do not dispute that the data set employed was incomplete.  They only dispute whether that deficiency was (1) able to be cured, and (2) fatal to the accuracy of Leitzinger's analysis in any event.

of the conspiracy and restoration of competition to the market – *i.e.*, the margins generally were reduced and generators began getting more money for their scrap after the conspiracy ended.  Leitzinger referred to these differences, as "price spreads."  He then averaged all of the price spreads to identify what he claimed to be a uniform "undercharge" that had existed during the conspiracy period and negatively – and uniformly – affected the price-per-ton each generator had received for its scrap.[38]

### *Scrap Price Bulletin ("SPB")*

As noted, the index that Leitzinger used was the SPB, which evidence at trial revealed was commonly used by dealers as a benchmark for processed scrap (ferrous) pricing decisions.[39]  The SPB contained pricing information for processed scrap, such that a dealer's pricing negotiations with a mill or foundry often turned upon the price fluctuations identified in the SPB.  In December of 1998 and October of 1999, however, *Iron Age Magazine* issued a correction to the SPB, explaining that certain ferrous scrap pricing information had been incorrect.  It is these "corrections," and the asserted effect they had on the integrity of Leitzinger's analysis, with which Columbia takes issue.

Based on the undisputed fact that the SPB contained erroneous information in late 1998 and 1999, Columbia argues that it necessarily cannot be a reliable source for Leitzinger's pricing information, which was a critical component of his damages model.[40]  While Columbia's expert agrees

---

[38]     *See In re Industrial Silicon Antitrust Litigation*, 1998 WL 103157 (W.D. Pa. 1998) (applying a similar methodology).

[39]     Among other evidence on this point, Ron Bone, a Columbia employee, testified that Columbia calculated its bids (for ferrous scrap) based on the SPB.  *See* Tr. at 370.  Indeed, Columbia's own expert verified that Columbia relied on the SPB for ferrous scrap transactions.

[40]     In sum, the SPB adjustments in 1998 and 1999 reflected prices beyond those of normal market fluctuations – so as to correct the prior inaccuracies.

that a uniform pricing index is necessary to the calculations Leitzinger provided, he disagreed with the use of the SPB.

Columbia's concerns about the 1998 and 1999 corrections are mitigated, however, in two respects.  First, Leitzinger did not ignore the adjustments made to the SPB's quotes.  As he testified at trial, he sought to account for the adjustments – to the extent it was even necessary – by "backing them out" of his analysis, thereby blunting any *arguable* effect they may have had.  Second, it is undisputed that the scrap dealers were using the SPB throughout the relevant time periods, in any event, such that any erroneous information it contained would have had little practical impact.  On this point, Plaintiffs logically argued both to the Court (*Daubert*) and the jury (trial) that, because the SPB was an accepted – and used – pricing benchmark, any errors it contained at a given time affected everyone equally, ergo, it did not fatally flaw Leitzinger's analysis.  In other words, it was not relevant whether the SPB numbers were accurate; what is relevant is that industry participants referred to those numbers, even if wrong, for their pricing decisions.

Setting aside the issues of whether the SPB was the <u>best</u> index to use and whether it contained admitted inaccuracies at various relevant times, Columbia's own expert agreed that, to perform Leitzinger's analysis, <u>an</u> index was required.  McAnneny did not testify that he did an independent damages analysis, or that he thought Leitzinger's model is not a viable economic tool for measuring damages under the circumstances of this case.  Rather, he only testified as to his disagreement with

31

certain aspects of how Leitzinger applied his model.[41]  Indeed, though he selected a different index –

*American Metal Markets* – McAnneny used a pricing index <u>when he employed Leitzinger's economic</u>

<u>model</u> to generate his competing "worst case scenario" damages figure of $1.9 million.

In the end, logical economic justifications support *both* Leitzinger's and McAnneny's competing

"expert" views, from which a reasonable jury could – and should be permitted to – conclude that either

expert's views, or portions thereof, have merit.  Under such circumstances, these types of strengths and

weaknesses are most appropriately left to the jury for resolution, as was done here.  Though Columbia

has no doubt identified weaknesses in Leitzinger's method, as have the Plaintiffs' in McAnneny's

criticisms of that method, they remain just that – weaknesses, not fundamental econometric flaws.

Columbia has not appropriately challenged the theory underlying Leitzinger's method, it has only

challenged – successfully in <u>some</u> respects, as evidenced by the verdict – the accuracy of some of his

underlying data and assumptions.  For this reason, Columbia's arguments relative to the SPB were most

---

[41]     As noted previously, another criticism Columbia previously raised, but does not highlight in its briefing on the present motions, was Leitzinger's use of only the Weingold and Rock electronic transaction data.  Columbia's view – expressed both through counsel's argument and McAnneny's testimony – was that use of such a limited number of transactions, touching upon only a limited number of generators (69), necessarily tainted Leitzinger's analysis.  Leitzinger's justification for using only the electronic data from Weingold and Rock, however, was that (1) it was the only information that was readily available, and (2) to the extent other "paper" information was available, it would have been incredibly difficult, if not impossible, to use.  In this regard, the conspirators must at some point bear the burden for various uncertainties.  *See Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

In any event, though McAnneny criticized Leitzinger's source of information and suggested more "accurate" alternatives (or additions), he did not himself pursue those alternatives or perform an independent analysis to demonstrate the deficiencies he avers exist in Leitzinger's analysis.

32

appropriately reserved for cross-examination at trial.  Its use did not so taint Leitzinger's analysis as to render his testimony unworthy of the jury's consideration.

### *Averaging Price Spreads*

Columbia also challenges Leitzinger's decision to average the varying price spreads in his sample to determine an "average undercharge" experienced by the class during the conspiracy period, which he then applied to the total volume of ferrous scrap sales during the conspiracy to calculate a class-wide damage figure.  The underlying basis for Columbia's objection to Leitzinger's averaging rests on Columbia's criticisms – principally through its expert – of Leitzinger's threshold premise that the scrap metal market in Northeastern Ohio was a well-functioning market where the "law of one price" was operating.  In a well-functioning market, the experts agree that, if a conspiracy impacts the market, that impact is uniform – *e.g.*, a uniform undercharge.  McAnneny called into question, however, Leitzinger's threshold conclusion that the relevant scrap metal market was well-functioning, and therefore subject to a uniform impact, if an impact existed.

McAnneny's disagreement with Leitzinger's opinion that the market was "well-functioning," however, was not based on an independent analysis of the relevant scrap metal market.  Rather, it was based on his limited view that the data Leitzinger used – *i.e.*, the price spreads derived from the Weingold and Rock electronic data – were too diverse.  He explained that, if the market had been "well-functioning," one would expect to see more uniformity among the calculated price spreads.  In this regard, it is ironic that McAnneny's criticism of Leitzinger's view of the market generally was premised upon the very data McAnneny challenged as being deficient and fundamentally flawed.  That fact notwithstanding, McAnneny only testified that the available data undermined Leitzinger's threshold

conclusion; he did not testify that, based on an independent analysis of the market (as Leitzinger had done prior to evaluating the price spreads), the market was not well-functioning.

Accordingly, McAnneny's criticism of Leitzinger's view that the relevant market was well-functioning does not amount to competing expert testimony that the market was, in fact, not well-functioning.  Leitzinger's opinion on this threshold issue, therefore, is unrebutted.  Assuming Leitzinger's unrebutted view that the market operated in a manner that would yield a uniform impact from an anti-competitive conspiracy, therefore, Columbia's challenge to Leitzinger's "averaging" of the price spreads to reveal that uniform impact can only be relevant here – or to the Court's prior *Daubert* considerations – if "averaging" is not a generally accepted or legally acceptable economic tool for identifying uniform impacts.

That is not the case, however.  Recognizing that antitrust cases present damages questions that often  are not amenable to concrete mathematical calculations, court have regularly recognized averaging of overcharges as a valid method for determining a uniform undercharge (or overcharge, as the case may be) in well-functioning markets.  *See generally, Conwood Company v. United States Tobacco Company, 290 F.3d 768* (6h Cir. 2002); *Paper Systems Incorporated v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wis. 2000); and *In re Industrial Silicon Antitrust Litigation*, 1998 WL 103157 (W.D. Pa. 1998).  At best, therefore, Columbia's challenges to the accuracy of Leitzinger's averaged undercharge (*i.e.*, a 16.4% uniform undercharge during the conspiracy), under the circumstances of this case, was best left to cross-examination before the jury, from which the jury could make its own credibility and value judgments.  Had McAnneny performed an independent analysis and opined that the relevant market actually was not well-functioning, thereby directly contesting – or at least

substantially challenging – Leitzinger's conclusion on that point beyond a generic observation of some limited data, perhaps Columbia would have had a better argument.

### 2.    Sufficiency of the Evidence – Injury and Damages

In so far as Leitzinger's testimony was admissible, it was a viable source of evidence on the issues of injury and damages.  Though confused by voluminous *Daubert*-related arguments, Columbia's challenges to the Plaintiffs' proofs on these issues is simply that the Plaintiffs failed to provide the jury with sufficient evidence to support the jury's finding of individual (*i.e.*, Named Plaintiff) and market-wide injury and damages. Having resolved the issue of whether Leitzinger's testimony was properly before the jury, at best, Columbia's argument boils down to the assertion that Leitzinger's testimony alone is insufficient for the jury to have found injury and damages.  For the reasons briefly outlined below, the Court finds that the Plaintiffs presented sufficient evidence to support the jury's specific findings on these elements.[42]

There is no dispute among the parties that, in order to sustain their claims, the Plaintiffs had the burden at trial to present:  (1) sufficient evidence of injury to the named Plaintiffs and the market as a whole; and (2) sufficient evidence that the named Plaintiffs and the market as a whole suffered measurable damages.  Nor do the parties dispute that the named Plaintiffs generated (and sold) scrap

---

[42]    In this regard, the jury specifically was instructed that, in order to find any Defendant liable, it had to find individual and market-wide injury.  To that end, the Verdict Form (Doc. 636) presented a series of seven questions identifying the jury's unanimous agreement as to each of the findings it needed to make to support a finding of liability.  As to Columbia, the jury responded in the affirmative as to each.  It is undisputed, therefore, that the jury found individual and market-wide injury resulting from the conspiracy it found to have existed during the alleged conspiracy period.  Based on the experts' competing views, then, it quantified that harm.

to various dealer-Defendants during the conspiracy period.  The principle evidence Plaintiffs presented on these issues was Leitzinger's testimony, though representatives of the named Plaintiff companies provided evidence of their respective sales volumes.

In sum, Leitzinger testified that, if a conspiracy to depress prices *via* customer allocation existed during the alleged period, it would have uniformly impacted the relevant scrap metal market, and that impact would have been one that was shared in common by <u>all</u> of the ferrous generators.[43]  He went on to testify that the uniform injury experienced by <u>all</u> of the ferrous class members was a 16.4% undercharge during the conspiracy period.  Further, Leitzinger testified that the undercharge experienced by the named Plaintiffs specifically was 16.4% as well.[44]

As evidenced by the fact that most of its Reply Brief is dedicated to *Daubert* issues, Columbia's sufficiency challenges here are essentially *contingent* on Leitzinger's testimony being deemed inadmissible.  For example, Columbia states:

> . . . there is no basis in law or economics for accepting Dr. Leitzinger's averaging methodology.  <u>If that methodology is rejected</u> by the Court, as it must be, <u>there is no evidence</u> whatsoever concerning the impact of the alleged conspiracy on either Lincoln Electric or Profile Grinding.

Doc. 658 at 12 (emphasis added).  If admissible, and credited by the jury (even if only in part), the thrust of Columbia's arguments wither.  "It is well-established that proving antitrust injury should not be unduly rigorous."  *Schwartz v. Sun Co., Inc.*, 276 F.3d 900 (6th Cir. 2002).  Though not in the form of specific transaction-related evidence relative to the named Plaintiffs themselves, the Plaintiffs clearly presented evidence of injury and damages on behalf of the named Plaintiffs specifically and the class

---

[43]     Tr. at 847.

[44]     Tr. at 1024.

36

members generally.  On this point, Columbia argues that, at least, the Plaintiffs should have been obligated to provide transaction-based evidence from the named Plaintiffs to demonstrate their individualized injuries and damages during the conspiracy period.  While there is a facial logic to this demand, it is ultimately belied by Leitzinger's testimony.

Leitzinger unambiguously testified that the named Plaintiffs were injured, and that they were damaged *via* a 16% undercharge.  He further explained, that, while his analyses of the 69 companies in his sample group did not yield perfectly accurate generator-by-generator undercharge figures, those raw figures contained inadvertent errors, which he could not verify (much less correct) because he had only limited electronic data and no actual invoices that could be used to cross-reference the data.[45]  For this very reason, he testified that "averaging" was necessary to identify the actual uniform damage every Plaintiff suffered.  Accordingly, even had Leitzinger done independent analyses of the named Plaintiffs' transactions, he would not have testified that their results identified those Plaintiffs' damages.  Pursuant to his methodology, therefore, Leitzinger was the only source of the very evidence Columbia claims is insufficient – *i.e.*, the average undercharge figure.  *See Paper Systems, Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601 (E.D. Wis. 2000) (econometric method of determining average overcharge "promises to provide precisely the kind of single mathematical formula which can establish each class member's damages" despite the expert's concession that the actual overcharge varied between class members).

If credited, therefore, Leitzinger's testimony clearly established evidence of injury to the named Plaintiffs and the class as a whole, and measurable damages to the named Plaintiffs and the class as a

---

[45]     Leitzinger explained that data of this type commonly has errors in it that originate with the provider of the data.  For example, he explained that – given that the data used was electronic (which made its use practical) – various figures likely were transposed or otherwise incorrectly inputted, thereby *mildly* impacting the data's accuracy.

whole.  Under the circumstances of this case, despite its weaknesses, the Court deems Leitzinger's

testimony sufficient to satisfy the Plaintiffs' burdens of proof under Rule 50.  If the jury credited

Leitzinger's conclusions – in whole or in part – it reasonably could have reached the conclusions that

it did.  For these reasons, Columbia's motion for judgment as a matter of law and for a new trial cannot

be granted on these bases.[46]

The Court makes one final observation regarding the nature and strength of Leitzinger's

testimony.  As noted, the Court spent a substantial period of time analyzing, and re-analyzing, the

Defendants' *Daubert* motions seeking to exclude Leitzinger's testimony in its entirety.  The Court felt

that Defendants' challenges were substantial and written attacks on his testimony articulately stated.

It was only after several passes through the motion papers that the Court was able to understand that

those challenges, though pointed, went to the weight and not the admissibility of Leitzinger's opinions

– *i.e.*, did not justify the wholesale exclusion of testimony Defendants sought.

The Court finds it notable that, after hearing Leitzinger's testimony in open court, hearing his

responses to counsel's pointed attacks on cross-examination, and hearing what ultimately proved to be

only limited critiques of Leitzinger's analysis by McAnneny, the Court was *more* convinced that it had

been when it made its initial *Daubert* ruling that its ruling was correct.  In other words, Defendants'

predictions regarding Leitzinger's testimony and the attacks they planned to levy on it, through cross-

examination and McAnneny's testimony, were overstated.  As it actually played out in Court, it became

clear that Leitzinger's testimony was less susceptible to attack than Defendants originally claimed and

---

[46]     Again, it is not this Court's role to decide whether it finds room to criticize
Leitzinger's testimony, or even whether it could have rendered a verdict in favor
of Plaintiffs on the strength of that testimony; the only question is whether the
evidence would allow reasonable minds to reach such a verdict, after drawing all
reasonable inferences from that evidence in Plaintiffs' favor.

that McAnneny himself would provide Defendants far less fodder for that attack than they predicted.
Ultimately, the debate over Leitzinger's testimony was left where it should have remained – with the
jury.

### C.      Motion for New Trial – Rule 59(a)[47]

Columbia's motion for a new trial presents 19 bases for its argument that it is entitled to a new
trial and/or a reduction of the judgment.  For the reasons outlined above, the Court need not address
many of these arguments – namely, arguments 4, 5, 10, 11, 15, 16, 17, 18 and  19.  Arguments 1, 2, 3,
8, 9 and 13, which simply mirror the arguments raised in Columbia's motion for judgment as a matter
of law, fail for the reasons outlined *supra* and, therefore, do not warrant additional consideration here.
Accordingly, the Court's substantive analysis of Columbia's motion for a new trial is limited to
Columbia's 6th, 7th and 14th arguments in that motion.

### 1.      Legal Standard for Rule 59(a)

Pursuant to Rule 59(a), the Court is empowered to grant a new trial.  Fed. R. Civ. P. 59(a).  In
contrast to judgment as a matter of law, "[t]he authority to grant a new trial is confided almost entirely
to the exercise of discretion on the part of the trial court."  *Williamson v. Owens-Illinois, Inc.*, 787 F.2d
594, 1986 WL 16533 at *3 (6th Cir. 1986) (quoting 11 Wright & Miller, <u>Federal Practice and
Procedure</u>, §2806 (1973)).  When reviewing a motion for a new trial, a court "should indulge all
presumptions in favor of the validity of the jury's verdict."  *Brooks v. Toyotomi Co.*, 86 F.3d 582, 588
(6th Cir. 1996) (citing *Ragnar Benson, Inc. v. Kassab*, 325 F.2d 591, 594 (3rd Cir. 1963)).  A jury

---

[47]      Columbia references Rule 59(b) in its motion (Doc. 646 at 1), which is merely
directed toward the time frame within which a party must file a motion for a new
trial.  The Court views Columbia's motion for a new trial as having been
appropriately filed under Rule 59(a).

verdict must be upheld so long as there is any competent and substantial evidence in the record to support it, even if contradictory evidence was presented.  *Green v. Francis*, 705 F.2d 846, 849 (6th Cir. 1983).

A motion for a new trial should be denied "if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable."  *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins., Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991); *see also Brooks v. Toyotomi Co.*, 86 F.3d 582, 588 (6th Cir. 1996) (conflicting evidence, standing alone, "is not sufficient to justify overturning the jury's verdict").  The simple fact that "the grant of a new trial might result in a different outcome is not a valid ground for disturbing a jury's verdict which is otherwise based upon legally sufficient evidence."  *Brooks*, 86 F.3d at 588 (citation omitted).  The "true standard for granting a new trial on the basis of the weight of the evidence is simply one which measures the result in terms of whether a miscarriage of justice has occurred."  *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187 (8th Cir. 1972), *cert. denied*, 410 U.S. 930 (1973).[48]  A court also may grant a new trial based on a prejudicial error of law.  *Klein v. Hollings*, 992 F.2d 1285 (3d Cir. 1993).

Accordingly, a district court "must compare the opposing proofs, weigh the evidence, and set aside the verdict only if it determines that the verdict is against the clear weight of the evidence."  *McDonald v. Petree*, 409 F.3d 724 (6th Cir. 2005).  "Thus, on a motion for a new trial, as contrasted with a motion for [judgment as a matter of law], the judge may set aside the verdict even though there

---

[48]     The Third Circuit has gone so far as to state that a court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."  *Williamson v. Conrail*, 926 F.2d 1344 (3d Cir. 1991).

40

exists substantial evidence to support it." *Id*.  However, the district court "should refrain from interfering with a jury's verdict unless it is clear that the jury reached a seriously erroneous result." *Brooks,* 86 F.3d at 588.  The Sixth Circuit has explained that a "seriously erroneous result" should be evidenced by:  (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion – *i.e.*, the proceedings having been influenced by prejudice or bias.  *Holmes v. City of Massillon*, 78 F.3d 1041 (6th Cir. 1996).

In deciding whether to grant a new trial on the basis of prejudice through judicial error, courts consider each argument under the umbrella of Rule 61, which states:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, <u>unless refusal to take such action appears to the court inconsistent with substantial justice</u>.  The court at every stage of the proceedings must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed. Civ. R. 61 (emphasis added).  Accordingly, a party seeking a new trial under Rule 59(e) must show two things.  As a preliminary matter, it must show that the Court actually acted erroneously.  Then, once error has been established, it must show that the error prejudiced the proceedings in a substantive way.

## 2.      Discussion of Rule 59(a) Motion

For the reasons outlined above, the Court's substantive analysis of Columbia's Rule 59(b) motion is limited to arguments 6, 7 and 14 in that motion.  Those arguments are addressed to:  (1) the Court's refusal to decertify the Plaintiff Class on the eve of trial; (2) the Court's statute of limitations jury instruction; and (3) the Court's decision not to allow Columbia to present evidence that it was neither charged with, nor convicted of, any criminal conduct.  The Court addresses each in turn.

41

       a.       **The Court's Refusal to Decertify the Plaintiff Class on the Eve of Trial (Argument 6)**

Columbia briefly[49] argues that it is entitled to a new trial because the Court denied its motion to decertify the Plaintiff Class.  In sum, Columbia simply reiterates, though more briefly, the argument presented in its pre-trial motion on that issue (Doc. 584).[50]  For the same reasons the Court denied Columbia's motion in the first instance, the Court likewise denies its request for a new trial.  The Court briefly outlines its decision because it did not have an opportunity to do so previously.

On January 20, 2006, four days before the trial in this case was set to begin, Columbia requested that the Court decertify the Plaintiff Class – and require the two named Plaintiffs to proceed on their own – because it believed that the Plaintiffs had failed adequately to provide notice to the absent class members that the verdict and judgment in this case would be binding upon them.[51]  Despite any potential merit Columbia's argument *may* have had if timely asserted, Columbia's motion came far too

---

[49]    As with the bulk of Columbia's arguments in support of its request for a new trial, Columbia raises the decertification issue in its motion, but does not outline in any detail the substance of its position – neither in the motion, nor the Reply Brief.

[50]    Columbia's motion for a new trial also charges that the Court should have decertified the class – per its motion – because the Plaintiffs had no evidence of injury to the nonferrous generators.  Columbia's motion to decertify, however, did not present that argument as a basis for decertification.  Rather, Columbia's motion only argued that decertification was required due to deficiencies in the notice provided to the class.  In so far as this additional issue was not previously raised, and the Court finds it without merit in any event, the Court does not address it here.

[51]    Columbia's motion was directed toward the nonferrous class members, who stood to recover nothing from the present case except a likely adverse judgment.

42

late in the process to warrant substantive consideration by the Court.

Accordingly, as outlined by the Court on January 24, 2006, Columbia's request to decertify the Plaintiff Class literally on the eve of trial was inappropriate and untimely.  Columbia's explanation for filing its motion on the eve of trial is that it did not "think of" the notice issue until the Bluestar settlement occurred.  Regardless of the Bluestar settlement, however, Columbia was obliged to consider and evaluate the notice issue long before the week of trial.  Indeed, Columbia had ample opportunities to raise this issue including, but not limited to, in a dispositive motion.[52]

As opposed to its purported concern that an unsuspecting absent class member would be harmed by virtue of a verdict and judgment being binding against him, Plaintiffs theorized that it was likely that Columbia's last-minute decision to file its motion related more to a desire to disrupt the Plaintiffs' trail preparations.  Whatever the reason, Columbia's woefully belated decertification motion was properly denied and, therefore, cannot serve as a basis for a new trial.

### b.   Statute of Limitations Jury Instruction (Argument 7)

In addition to its argument that the Plaintiffs have provided insufficient evidence that Columbia was a member of the conspiracy during the statute of limitations period (outlined and addressed above), Columbia also argues that the Court erroneously instructed the jury[53] as to the critical date "on or after

---

[52]    Columbia objected neither to class certification, nor the attendant notices that were sent to the Plaintiff generators, a process that occurred in late 2003 and early 2004.  Nor did Columbia object to the notice that had been provided after Dr. Leitzinger's report was produced.

[53]    The statute of limitations instruction appears at page 43 in the Court's *Jury Instructions* (Doc. 631).

43

which" Columbia must have participated in the conspiracy – *i.e.*, March of 1996.[54]  On this ground, Columbia seeks a new trial.

Refusing to acknowledge the possibility of statutory tolling under 15 U.S.C. § 16(i), Columbia's proposed jury instruction on the statute of limitations issue identified August 15, 1998 as the critical date "on or after which" the Plaintiffs had to establish Columbia's participation in the alleged conspiracy.[55]  Following briefing and argument on the issue, however, the Court concluded that § 16(i) tolled the statute of limitations.  That section provides:

> (i) Suspension of limitations
>
> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under Section 15a of this title, the running of the statute of limitations in respect to <u>every</u> private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however*, that whenever the running of the statute of limitations in respect of a cause of action arising under Section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.  (Emphasis added)

Based on the government's initiation of <u>formal</u> proceedings against former-Defendant Bay Metals in March of 2000, as well as the various other proceedings instituted against various other scrap dealers in the years that followed, the Court concluded that statutory tolling under § 16(i) began in March of

---

[54]   Though they dispute the "critical date," the parties do not dispute that a 4-year statute of limitations period applies.

[55]   In reaching this date, Columbia generically applied the 4-year limitations period to the filing date of this case <u>against it</u> – *i.e.*, August 15, 2002.  *See* Doc. 571 at Proposed Instruction #50 (p. 93 of 109).  Columbia did not take into account any tolling – statutory or otherwise – because it argued that no tolling was appropriate.

2000 and continued at least until August of 2002 when this case was filed.  Accordingly, the Court set

March of 1996 as the critical date for statute of limitations purposes – *i.e.*, 4 years earlier.[56]

Columbia attacks the Court's application of § 16(i) in two respects.  First, Columbia argues that

the government's suit against Bay Metals did not activate tolling under § 16(i) because Columbia was

not a defendant in that case, and the allegations in that case were different from the allegations in this

case.  Second, even assuming that tolling under § 16(i) is appropriate *vis-a-vis* the Bay Metals case,

because that case ended in June of 2000, Columbia argues that tolling would have continued only until

June of 2001 per § 16(i)'s one-year trailer period following the conclusion of governmental

proceedings.  Columbia argues, therefore, that the 14-months between June of 2001 and August of 2002

(when Plaintiffs filed this case) must count against the statute of limitations period.  As such, Columbia

alternatively argues that the Court, at most, only should have looked back 2 years and 10 months – *i.e.*,

4 years minus 14 months – from March of 2000, instead of a full 4 years.  Columbia contends, therefore,

that the earliest possible critical date "on or after which" the Plaintiffs had to establish Columbia's

participation in the alleged conspiracy was May of 1997 (*i.e.*, 2 years and 10 months before March of

2000) and not March of 1996.

Though Columbia does articulate its position on this issue, that position is no different from the

---

[56]     On this issue, the Plaintiffs argued that the government's initiation of an investigation into the scrap metal industry was sufficient to trigger tolling under § 16(i) and that formal proceedings (*via* information or indictment) were not necessary.  *See* Doc. 617.  Were that the case, tolling would have started much earlier than March of 2000, when the first formal proceeding began against Bay Metal.  Based on substantial independent research on this issue, the Court concluded that a governmental investigation was insufficient.  Columbia cannot argue, therefore, that it was met with resistence at every turn.  Clearly, the Court's independent research on this issue inured to Columbia's benefit and made it much more difficult for Plaintiffs to prevail on its claims against Columbia.

45

one it took at trial.  As at trial, Columbia fails to cite any legal authority in support of its position.

While the Court agreed with Columbia's trial argument that more than a government investigation is needed to activate § 16(i), it does not agree that the allegations in a prior government proceeding must be identical to a subsequent civil case for § 16(i) to apply.  Nor does the Court agree that § 16(i) requires that Columbia have been a defendant in the prior governmental proceeding.  Such is not the law.  Indeed, in *Leh v. General Petroleum Corporation*, 382 U.S. 54, 59 (1966), the Supreme Court addressed this very issue stating that a "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants."[57] Accordingly, simply because the conspiracy alleged in this case *may* differ slightly from the conspiracy alleged in the Bay Metals case, and because Columbia was not a named defendant in that case, does not automatically prevent § 16(i)'s application.  Because the Court finds the government's allegations against Bay Metals to be substantially similar to the Plaintiffs' allegations here, and because it finds that the government alleged facts relating to a market-wide scrap metal conspiracy, the Court concludes that tolling is appropriate under 15 U.S.C. § 16(i) as of March 2000.

With regard to Columbia's secondary argument that, assuming it was appropriate, the tolling from the Bay Metals case ceased in June of 2001, Plaintiffs accurately point out that the Bay Metals

---

[57]     *See also, Zenith Radio Corp., v. Hazeltine Research, Inc.*, 401 U.S. 321, 337-38 (1971) ("[A] private party who brings suit for a conspiracy against which the Government has already brought suit is undeniably basing its claim in whole or in part upon the matter complained of in the Government suit, even if the defendant named in the private suit was named neither as a defendant nor as a coconspirator by the Government); and *Philip Morris, Inc. v. Heinrich*, 1996 U.S. Dist. LEXIS 9156 at 33-34 (S.D.N.Y. June 28,1996) (the statute of limitations is tolled as to all defendants by Government's filing of a criminal information against one defendant regarding the same conspiracy).

case was simply the first of several actions brought by the government relating to bid-rigging in the scrap industry in Northeastern Ohio, each of which implicated § 16(i) for the same reason the Bay Metals case did.  As the Plaintiffs point out, the statute of limitations, once tolled by government action under § 16(i), remains tolled until the last action against all defendants is resolved.[58]  Columbia fails even to respond to this argument in its Reply Brief.

For these reasons, the Court rejects Columbia's unsupported view that the Court's statute of limitations instruction was erroneous.  Columbia, therefore, is not entitled to a new trial on that ground.

### c.      Columbia Was Not Permitted to Present Evidence that it was Neither Charged nor Convicted of Criminal Conduct (Argument 14)

Columbia argues that, because the Court prohibited it from presenting direct evidence that it was neither charged nor convicted of any criminal conduct, it is entitled to a new trial because it was prevented from:  (1) rebutting Plaintiffs' guilt-by-association theme; and (2) effectively attacking Dr. Leitzinger's use of transaction data from convicted felons.   As an initial matter, Columbia's characterization of the Court's limitation of Columbia's presentation of evidence (or argument) to the jury is incorrect.

This issue initially was addressed in a motion in limine, which the Court granted in part and denied in part.  In a written pre-trial order, the Court explained that:

> Defendants are not permitted initially to argue, or otherwise mention, that they were <u>not</u> prosecuted criminally for alleged antitrust violations.  Upon request by the Defendants *after* the Plaintiffs' presentation of proofs, however, such argument *may* be permitted if the Court determines that fairness so requires.

---

[58]      *Cf. Marine Firemen's Union v. Owens-Corning Fiberglass Corp.*, 503 F.2d 246, 249 (9th Cir. 1974); and *New Jersey v. Morton Salt Co.*, 387 F.2d 94, 99 (3d Cir. 1967).

Doc. 583 at 2 (emphasis in original).  Despite the Court's solicitation, Columbia never sought permission later to present evidence, or otherwise argue, that it had never been charged or convicted of anything.  Accordingly, Columbia <u>waived this issue</u> by failing to pursue it, as ordered by the Court. For this reason alone, Columbia's argument that the Court's limitation warrants the extraordinary remedy of a new trial fails.

In any event, identifying each of them by name, Columbia's counsel emphasized in his opening argument that most, if not all, of the other alleged conspirators had been charged and/or convicted of criminal activity.  *See* Tr. at 79-80.  Obviously, Columbia was not included in that narrative, thereby providing the clear negative implication that the government had not pursued Columbia criminally. Though only through argument, Columbia made its point to the jury in any event.

A review of the trial transcript leaves no doubt, moreover that the jury was fully aware that the data upon which Dr. Leitzinger relied had been provided by "convicted felons."  Indeed, counsel for both Columbia and DeMilta argued this point vigorously when they asked the jury to disregard all evidence from the alleged co-conspirators on grounds that it was tainted – either by their alleged criminality or by their motive to ingratiate themselves with the government by aiding the victims of their criminal conduct in the victim's civil action.

These bases notwithstanding, Columbia presents no legal support for the proposition that it should have been permitted – under any circumstances – to present evidence that the government had neither charged nor convicted it of criminal activity.  This deficiency, along with the fact that the government may elect not to pursue a target for a variety of reasons other than the belief that the target is innocent, supports the Court's discretionary decision not to permit Columbia to present evidence of governmental inaction. Further, as noted by the Court during the trial, the government's inaction to date

may be just that, inaction to date. For all these reasons, Columbia's request for a new trial on this ground is rejected.

### D.    Motion to Amend Judgment – Rule 59(e) (Remittitur)

In the alternative, Columbia requests that the Court reduce the present judgment to $1,914,658, which is the figure presented by Dr. McAnneny based on his "corrected" application of Leitzinger's methodology. For the reasons briefly stated below, Columbia's alternative motion must be denied.

#### 1.    Legal Standard for Rule 59(e)

As a general rule, the Sixth Circuit has held that "a jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (quoting *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990). A trial court is within its discretion in remitting a verdict "only when, after reviewing all the evidence in the light most favorable to the prevailing party, it is convinced that the verdict is clearly excessive; resulted from passion, bias, or prejudice; or is so excessive or inadequate as to shock the conscience of the court." *Id.* (Emphasis added). "If there is any credible evidence to support a verdict, it should not be set aside." *Id.*

#### 2.    Discussion of Rule 59(e) Motion

In sum, Columbia argues that the jury's verdict is necessarily flawed – and warrants reduction – because it does not adopt either of the parties' experts' *exact* damages calculations. The essence of this argument, therefore, is not that the verdict was excessive, but that it was not exact. To that end, Columbia cites *Gregory v. Shelby County, Tenn.*, 220 F.3d 433 (6th Cir. 2000), for the general proposition that a "remittitur is available where, as here, an award is not supportable by the proof." *See*

49

Doc. 646 at 8.  While that general proposition is certainly not inaccurate, it does not detract from the Sixth Circuit's more focused, and well-settled, view that remittitur of a jury's verdict is only permissible when the verdict is clearly excessive.  In determining "excessiveness," this  Court must:  (1) evaluate all of the evidence in a light most favorable to the Plaintiffs; and (2) conclude that the jury's verdict resulted from passion, bias or prejudice – or is simply so excessive that it shock's the Court's conscience.

Columbia has presented no argument on these points, or otherwise argued that the jury's verdict was excessive.  Rather, it has simply asserted the conclusory view that, because the jury did not adopt one of the two expert's competing (and very different) figures, its verdict cannot stand.  The verdict did not exceed Plaintiffs' estimate, nor did it exceed an amount upon which a reasonable jury could have agreed based on the evidence presented.  In this regard, the Sixth Circuit has recognized that Plaintiffs need not establish their damages in a concrete fashion, reasonable estimations are permitted:

> Because damages issues in these cases are rarely susceptible to the kind of concrete, detailed proof of injury which is available in other contexts, the Supreme Court has repeatedly held that in the absence of more precise proof, the factfinder "may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendencies to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

*Schwartz v. Sun co., Inc.*, 276 F.3d 900, 904 (6th Cir. 2002) (internal citation omitted).[59]  Here, in quantifying that harm the jury clearly found to have occurred, it was faced with two competing experts,

---

[59]     *See also In re Industrial Silicon Antitrust Litigation*, 1998 WL 103157 (W.D. Pa. 1998) ("an antitrust plaintiff need not prove damages with mathematical certainty, but rather, he need only introduce sufficient evidence of damages to allow a jury to estimate the amount of damages . . . [o]nce causation of damages is determined . . . the actual amount of damages may result from a reasonable estimate") (internal quotations omitted).

one of whom – Dr. McAnneny – was not hired to do an independent analysis, but only to evaluate the analysis performed by the other.  Though admissible, Columbia's counsel and its expert masterfully highlighted the weaknesses in Leitzinger's application of his methodology, but did not directly challenge the methodology itself.  That said, McAnneny challenged Leitzinger's calculations in several respects, any one of which the jury selectively could have credited.  Equally, the jury was free to credit one or more of Leitzinger's assumptions and, given the volume of data contained in the trial exhibits (which included transactional data), reach a reasonable estimate based on those credited portions of each experts' testimony.

Accordingly, sufficient evidence exists in the record to justify the jury's reasonable estimation of the damages they clearly determined to have occurred.  As such, the damages figure the jury returned cannot be said to be excessive.  The jury was clearly instructed on this area of the law.  For these reasons, and especially in light of the Court's conclusions relative to Columbia's motions for judgment as a matter of law and for a new trial, the jury's verdict must stand.

**III.    CONCLUSION**

For the foregoing reasons, *Columbia Iron and Metal Company's Renewed Motion for Judgment as a Matter of Law* (Doc. 645) is **DENIED**; *Columbia Iron and Metal Company's Renewed Motion for New Trial or Amendment of Judgment* (Doc. 646) is **DENIED**.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated:  September 30, 2006**

51